UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Bobby Jacox, | : | Case No. 1:06-cv-168 |
| Plaintiff, | : | |
| vs. | : | |
| Cincinnati Public Schools, et al., | : | |
| Defendants. | : | |

**ORDER**

Before the Court is Defendants' motion for summary judgment (Doc. 16).  Plaintiff opposes the motion (Doc. 20), and Defendant has replied (Doc. 21).  Plaintiff contends that his employer, Cincinnati Public Schools, discriminated and retaliated against him while he was teaching at Winton Hills Academy.

**FACTUAL BACKGROUND**

Bobby Jacox, an African-American male, is employed by Cincinnati Public Schools as a physical education teacher.  He has worked for CPS since 1991.  The terms and conditions of his employment are governed in many respects by collective bargaining agreements between CPS and the Cincinnati Federation of Teachers.  Prior to his job at CPS, Mr. Jacox was employed in the Dayton public schools.  He has a bachelor's and a master's degree from the University of Tennessee.

Defendant Christina Russo is the principal of Winton Hills

Academy (formerly called Winton Place), a K-8 grade school. Jacox worked at Winton Hills from 1994 until the end of the 2004-2005 school year. Since the fall of 2005, Jacox has been a full-time physical education teacher at CPS' Bond Hill school. Prior to Russo's arrival at Winton Hills, Gail Arnolds was principal. Jacox did not have any grievance issues concerning his working conditions while Ms. Arnold was principal.

Jacox alleges in his complaint that Russo subjected him to a pattern of racial intimidation and harassment, and created a hostile work environment on account of his race and his age. He alleges that Russo repeatedly tried to impede his job performance by limiting his position and his access to facilities and programs. He alleges that Russo continually denied or blocked his attempts to improve programs for his students, in an effort to get him to quit his job. Jacox claims that he was treated differently from other white teaching professionals at the school, and that Russo's goal was to replace the school's African-American staff with white employees.

Jacox testified in his deposition that Russo said things to him that he considered racially insulting, but he could not say specifically what she said, and could not remember most of the incidents. (Jacox Deposition p. 51.) Jacox stated that "her tone of voice" signaled to him that she was insulting him because of his race. He gave an example of a time he was sitting in the

lunchroom with other African-American staff members, watching over some unruly children; Russo shouted at him as though he were a child, "Mr. Jacox, didn't I tell you to watch those kids" or words to that effect. She used a tone of voice Jacox understood to be racially derogatory. (Jacox Deposition pp. 50-54.)

Jacox also testified that Russo turned other Winton Hills staff against him, identifying one staff member with whom he had gotten along prior to Russo's arrival; after Russo came to the school, that staff member "made a complete turnaround against me." (Jacox Deposition p. 58.) Jacox said that two African-American custodial employees told Jacox that they left their jobs at Winton Hills because they were afraid Russo would get them fired. Jacox believes Russo did the same thing to other African-Americans, but could not remember anyone else's name. (Jacox Deposition pp. 114-116.)

Jacox described Russo's disparate treatment of him, stating that she would overlook or excuse other staff who were late in the morning, or had to leave early in the day to deal with child care issues, but that Russo never allowed Jacox the same flexibility. He testified that Russo initiated a disciplinary hearing against him for being late to work, but could not remember the date or the year that took place. (He also could not remember if he was in fact disciplined, stating that it was discipline enough for him to be cited for such a hearing, when

"everyone else" in the building was regularly coming in late.)

Jacox also submitted an affidavit supporting his opposition to Defendants' motion for summary judgment, describing additional details about some incidents upon which he bases his claims. Jacox states that Russo failed to support him in dealing with parents on many occasions, and that he never observed her failing to support the white teachers. He describes a 1999 incident of a student falsely accusing Jacox of kicking the student; Russo contacted the parent about the student's false accusations, and then did not remain with Jacox to meet with that parent. In another 1999 incident, Russo accused him of causing a lawsuit against the school, falsely accusing him of hurting a child.

Jacox describes a November 2004 incident in which he helped break up a student fight. Another (white) teacher was there, and Jacox "handed" the female student to that teacher. Another scuffle between that teacher and the female student ensued, hurting both of them. When Russo arrived, she forced Jacox out of the room, telling him that the white teacher would handle the discipline, although Jacox protested that he was only looking after the student's possible injuries.

Jacox states that in August 2001, Russo refused to give him a key to a restroom that was close to the gymnasium, even though other teachers that Russo favored had their own keys. After several weeks, Russo finally gave him a key, although she did so

by coming to his office and "slamming the key" on his desk. At the same time (the start of the 2001-2002 year), Jacox did not receive new computer and video equipment, while the other teachers did; he asserts Russo told him to submit a written request, something that none of the white teachers had to do. After several follow-up requests, Jacox received the requested equipment.

When the school moved into a different building, Russo refused to allow Jacox to use the building's existing physical education office, and instead converted a small unheated closet space into an office. Jacox was forced to keep his desk in the gym because it would not fit into the closet space. Russo also refused a request to provide extra space by moving a wall of the closet out. Meanwhile, the existing physical education office was used by several white teachers on an intermittent basis.

Jacox also states that a school-wide policy prohibited teachers from parking on the circle driveway in front of the school. After the policy was announced, Jacox saw other teachers' vehicles parked on the circle "apparently" without complaint; but when he parked there, the school office sent him written complaints.

Jacox contends that as early as 2001, Russo suggested to him that he would not be at Winton Hills much longer. In early 2003, Russo proposed a budget for the next school year that would have

eliminated his position; but the school's budget committee apparently decided to cut his position to half-time rather than eliminate it entirely. Beginning in the fall of 2004, Jacox was assigned to work one-half time at Winton Hills and one-half time at Central Fairmont. For reasons not clear from the record, Jacox was told by someone at Central Fairmont that the school did not need him. Jacox returned to Winton Hills, which upset Russo, and she told him he could not be there. His physical education schedule at Winton Hills was Monday, Tuesday and a half-day Wednesday, and Jacox claims Russo denied him planning periods (non-teaching time) on those days, while other white teachers were allowed planning time. Russo also asked Jacox to do extra work the rest of the week, to which Jacox objected.

Jacox filed several union grievances about Russo. His November 19, 2004 grievance states that Russo was assigning him duties not permitted by the union contract, and was treating him unprofessionally. (Jacox Affidavit, Exhibit 8.) His December 1, 2004 grievance complained about a specific incident involving student discipline, and Russo's interference with Jacox' interaction with a student. (Id., Exhibit 9) This incident is explained in greater detail in Jacox' letter to the CPS Superintendent on November 19, 2004. (Id., Exhibit 11.) His letter states that Russo is "attacking him," and describes her "intrigue and clandestine treatment of me and her schematic

contrivances against me." The resolution of these grievances is not apparent from the record.

Concerning his age discrimination claim, Jacox testified about an incident where Russo and another teacher jokingly referred to his hearing impairment, asking him "if that was his good ear." Russo also inquired about his health at some point after Jacox had lost some weight. Jacox did not believe Russo was truly concerned about his health, and took her comments to be negative references to his age. (Jacox Deposition pp. 55-57.) Jacox could not identify other discriminatory references or actions that he believes were based on his age.

Jacox filed an EEOC charge on October 18, 2005 that alleged: "From prior to March 24, 2005 through June of 2005, I was harassed by Christina M. Russo (White, mid-50's, Principal) with declarations that I was surplus and she gave me warnings about my job performance. In August of 2005, I was reassigned to another school under another Principal." Jacox alleged he was discriminated against due to his race, age, and in retaliation for prior complaints. After the EEOC issued Jacox a right-to-sue letter, he timely filed his complaint in this court.

**ANALYSIS**

1. <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant

and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citations omitted).

2. <u>Title VII and ADEA Claims</u>.

Initially, Jacox concedes that he may not proceed against

Russo individually on his Title VII discrimination claim.  (See Doc. 20, p. 6 at n. 1.).  The Court will therefore analyze this claim solely with regard to Cincinnati Public Schools.

Jacox has no direct evidence of racial discrimination.  And CPS argues that Jacox has failed to establish a prima facie case of discriminatory treatment, under either Title VII or the ADEA.  A prima facie case of racial discrimination requires Jacox to establish: (1) he is a member of a protected class; (2) he suffered an adverse employment action or decision; (3) he was qualified for his position; and (4) similarly-situated non-minority employees were treated more favorably, or he was replaced by an employee outside of the protected class.  See McDonnell-Douglas v. Green, 411 U.S. 792, 802-804 (1973).  The same standard applies to age discrimination claims.  See Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538 (6th Cir. 2002).

There is no dispute that Jacox is a member of two protected classes: he is African-American, and he is over the age of 40.  CPS does not dispute Jacox' qualifications.  The primary dispute is whether Jacox suffered an adverse employment action or decision.  CPS also challenges Jacox' assertion that non-minority or younger employees were treated more favorably, noting that Jacox was not replaced - his position at Winton Hills was eliminated and he was transferred to a comparable position

-10-

without negative consequences.

    A.    <u>Adverse Employment Action</u>.

An actionable adverse employment action requires "material" adversity.  The Sixth Circuit has identified several factors the Court should consider in determining the materiality of an adverse action.  These include whether the action involved a job termination; a demotion coupled with decreased salary; a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; and any other indices that are unique to a particular employment situation.  Any change in the terms and conditions of employment must amount to more than inconvenience or shift in job responsibilities.  See <u>Kocsis v. Multi-Care Management, Inc.</u>, 97 F.3d 876, 886 (6th Cir. 1996) (internal citations and quotations omitted).

Jacox posits several adverse actions he contends are sufficient to establish his prima facie case.  First, he contends he was denied planning or conference periods on his Monday, Tuesday and half-day Wednesday schedule during the 2004-2005 year.  He claims that the other four white special teachers (art, music, computer and library) received such periods every day, while he had to teach classes every period.[1]  In addition to the

---

[1] Jacox attaches a copy of a school schedule purporting to establish the lack of planning time.  There are seventeen teacher names that appear on this schedule every day; Jacox' name does not appear at all; and there are large sections blocked out.

-11-

lack of planning time, Russo asked Jacox to perform other duties during the last half of the week such as substitute teaching. Jacox filed a union grievance that he was being assigned duties "other than what the collective bargaining agreement states." There is nothing in the record indicating the outcome of this grievance.  His written grievance does not mention or suggest that Jacox was complaining of racial discrimination, and his EEOC charge does not mention this issue.  In addition, Jacox contends that Russo **asked** him to perform other duties, but it is not clear whether he actually was required to do extra work, or for how long he was required to do so.

The Court concludes that a schedule rearrangement such as the one Jacox describes is not a materially adverse action. Assuming he worked "straight" hours for the first half of the week, his planning time was presumably provided in the last half of the week.  And if Jacox was deprived of planning time during the last half of the week due to other duties he was asked to do, he does not describe how that arrangement caused a **material** change in the terms and conditions of his employment.  Surely asking any employee to work longer hours or perform additional tasks may impose a burden on that employee.  But additional work tasks alone are insufficient to establish material adversity.

Jacox also relies on the series of incidents and encounters with Russo discussed above, including the lack of a restroom key;

-12-

the delay in receiving computer equipment; forcing him to use a closet as an office; her interference at times with his relationships with students and their parents; and her efforts to eliminate his job from the Winton Hills budget. A reasonable inference arises from the record that Jacox and Russo did not get along well with each other. However, as the Supreme Court recently noted in the context of unlawful retaliation, "personality conflicts at work that generate antipathy", and "'snubbing' by supervisors and co-workers" are not actionable adverse actions. Burlington R.R. v. White, 126 S.Ct. 2405, 2415 (2006) (internal citations omitted). Moreover, Title VII is not "a general civility code for the American workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Burlington requires a plaintiff to show that the challenged action ". . . well might have dissuaded a **reasonable** worker from making or supporting a charge of discrimination." Burlington, 126 S.Ct. at 2415 (internal citations and quotations omitted; emphasis added).

    The Court must conclude that the incidents Jacox recites, taken alone or as a group, do not constitute a **materially** adverse employment action that satisfies Jacox' burden of establishing a prima facie case. Jacox was not dissuaded from complaining that Russo's actions violated his collective bargaining contract rights, and it is difficult to conclude otherwise about any

racial discrimination complaints he might have, but did not, assert.

Finally, Jacox does not argue that his transfer to Bond Hill in 2005 constitutes an adverse action, and it clearly was not. Jacox admitted that his job, salary and benefits did not change, and he articulates no basis upon which the Court could infer that the transfer resulted in any materially adverse consequences for his employment situation.

    B.   <u>Disparate Treatment</u>.

Even if Jacox could establish an actionable, material adverse action, he has not established that he was treated differently than a similarly-situated, non-protected employee. Jacox was not replaced by anyone; his position at Winton Hills was eliminated, but he was transferred with no loss of salary or benefits. Jacox repeatedly asserts that Russo treated white teachers more favorably, but the record lacks evidence other than Jacox' own testimony to establish this assertion.

In <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 577 (6th Cir. 1992), the Sixth Circuit held:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects. . . . Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the

>       same conduct without such differentiating or
>       mitigating circumstances that would
>       distinguish their conduct or the employer's
>       treatment of them for it.

Id. at 583.

To meet this test, Jacox offers only his own affidavit and testimony. Much of what he presents is hearsay (such as the two maintenance workers telling Jacox why they left); his own subjective assessments of Russo's intent; or his own conclusions about his disparate treatment (such as parking his car in the traffic circle, or his office space assignment). This is plainly insufficient to satisfy Rule 56 standards. In Mitchell, for example, the Sixth Circuit affirmed the district court's conclusion that plaintiff's affidavit, not made on personal knowledge and which contained "rumors, conclusory allegations and subjective beliefs," was wholly insufficient to establish a claim of discrimination. Id. at 584-585. See also, Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 434 (6th Cir. 2002) (internal citation and quotation omitted), noting that plaintiff's conclusory allegations which were not supported by specific facts in the record were not sufficient to "stave off summary judgment." And see, Zolondek v. Worldwide Flight Servs., 2006 U.S. Dist. LEXIS 95711 (E.D.N.Y., Aug. 28, 2006), noting "It is well-settled that a plaintiff's speculations, generalities and gut feelings, however genuine, when unsupported by specific facts, do not allow for an inference of discrimination." Id. at

\*26.

The only evidence of age discrimination Jacox offers is his testimony about Russo's two comments referring to his hearing and his health. These are without doubt insufficient to support his claim, as Jacox has not offered any facts to support the balance of his prima facie burden on this question.

The Court concludes for all of these reasons that Jacox has not established a prima facie case of racial or age discrimination.

   C.   <u>Pretext</u>.

Even if Jacox established a prima facie case, by assuming that his schedule assignments and extra workload in the 2004-2005 school year constituted an adverse action or that he was singled out for this treatment because of his race, CPS has established that the reduction in his schedule was based on budgetary reasons. While Jacox challenges that, CPS has adduced evidence that the decision to move to a half-time physical education position (and then to eliminate the position from Winton Hills) was budget-driven, and has offered reasonable explanations for that decision. Therefore, Jacox would have to come forward with some evidence to establish pretext, which he has not done.

Jacox apparently disliked Russo, and they obviously disagreed with each other. But Jacox offers no admissible evidence that raises a reasonable inference that Russo's

-16-

treatment of him was based on his race or on his age. Jacox' union grievances and other complaints he made to CPS prior to his EEOC charge said nothing about racial or age discrimination, and his own opinions offered in this lawsuit are insufficient to raise a genuine issue of material fact about pretext.

III.    Retaliation.

Plaintiff's complaint also includes a retaliation claim, based on Defendants' response to Jacox' complaints about Russo. Title VII, 42 U.S.C. §2000e-3(a), forbids an employer from retaliating against an employee for opposing any practice made unlawful by that statute. A prima facie case of retaliation requires Jacox to establish that (1) he engaged in activity protected by Title VII; (2) CPS knew about it; and (3) subsequent adverse action taken against him was causally related to his protected activity. See Jacklyn v. Schering-Plough, 176 F.3d 921, 929-930 (6th Cir. 1999) (internal citations omitted).

The first complaint or grievance Jacox submitted that appears in the record is dated October 13, 2004 and concerns his half-time schedule during the 2004-2005 school year. Jacox states that he did not have daily preparation and/or conference time; he requested that classes be rescheduled "to allow me to have the appropriate daily preparation and/or conference time as other teachers, and as contractually agreed upon." Jacox cites a specific section of the Collective Bargaining Agreement which he

alleged was violated by his schedule. His grievance says nothing about racial or age discrimination. The same is true of the two other grievances that appear in the record (dated November 19, 2004 and December 1, 2004). Filing a grievance based on the terms and conditions of a collective bargaining agreement, with no mention of discrimination, is not a practice protected by Title VII. The statute's anti-retaliation provision is broad, but it requires the employee to engage in some conduct opposing practices that Title VII outlaws. See, e.g., <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270 (2001). Jacox did not invoke Title VII, or seek access to any of its remedial mechanisms, until his EEOC complaint of October, 2005. None of Russo's conduct occurring prior to June 2005 could be causally related to any complaints he made about discriminatory treatment made unlawful by Title VII. Therefore, Jacox' retaliation claim fails.

IV. <u>State Law Claims</u>.

Jacox concedes that his state law claims for slander per se and slander per quod are likely untimely, and are likely barred by Defendants' statutory immunity under Ohio law. Jacox does not contest the dismissal of these state law claims against the Defendants, and the Court will therefore grant Defendants summary judgment on those claims.

**CONCLUSION**

For all of the foregoing reasons, Defendants Cincinnati Public Schools and Christina M. Russo are granted summary judgment on Plaintiff's complaint, and all of the claims stated in the complaint are dismissed with prejudice.  THIS CASE IS CLOSED.

SO ORDERED.

DATED: July 26, 2007     s/Sandra S. Beckwith
                         Sandra S. Beckwith, Chief Judge
                          United States District Court